UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Nick Nelson,

Plaintiff,

v.

Ellerbe Becket Construction Services, Inc., Ellerbe Becket Co., and Ellerbe Becket, Inc.,

Defendant.

Civil File No. 01-1849 (MJD/JGL)

**MEMORANDUM AND ORDER**

---

Stephen W. Cooper, Stacey R. Everson, Cooper Law Firm for and on behalf of Plaintiff.

William D. Hull, John A. Markert, Coleman, Hull & van Vliet, for and on behalf of Defendants.

---

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment, and Plaintiff's Cross-Motion for Summary Judgment on his wage and hour claims. In the underlying Complaint, Plaintiff alleges that Defendants failed to pay him overtime wages in violation of the Fair Labor Standards Act ("FLSA") and Minnesota Fair Labor Standards Act ("MFLSA"). Plaintiff alleges that when he complained to his supervisors regarding the overtime issue Defendants retaliated against him by creating a hostile work environment and forcing him to quit his job. Plaintiff also alleges violations of the "whistleblower" provisions of the FLSA and the MFLSA.

SEP 18 2003
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

## II. BACKGROUND

Defendant Ellerbe Becket Co. is a Minnesota Corporation. Defendant Ellerbe Becket, Inc. ("EBI") is a Delaware corporation with offices throughout the United States, including Minneapolis. Ellerbe Becket Construction Services, Inc. ("EBCS") is a division of Ellerbe Becket, Inc., and conducts commercial construction throughout the United States.

On February 15, 2000, Plaintiff Nick Nelson ("Nelson") responded to an ad placed by EBCS in the Minneapolis Star & Tribune newspaper for a senior construction accountant. He was subsequently offered a position with EBCS on March 6, 2000. The offer letter that Nelson received specified Nelson's starting hourly wage at $24.04 ($50,000 per year), and stated that the position was "exempt from overtime payment." The offer letter also identified his supervisor as Sue Cronen ("Cronen"), the Project Accounting Manager in the Accounting Department at EBCS.

Nelson was assigned a pay grade of "11," which had a salary range from $35,233 to $52,849 per year. Nelson's job title was "Senior Accountant," although he ascribed to himself the job title of "Construction Accounting Manager" in at least one correspondence. A Personnel Action Notice written by Cronen on March 7, 2000, stated:

> Nick is our new construction accountant responsible for all accounting functions within EBCS including construction draws, cost analysis and tracking, and financial statement preparation. He will be working with Bob Huddleston to develop reporting tools for

EBCS including detailed information on warranty reserves, project insurance allocations and other areas as needed.

Nelson started his employ with EBCS on March 13, 2000.

On April 12, 2000, Nelson sent Cronen a memo detailing his frustrations with accounting practices at EBCS and what he described as, "what seems to be a very political workplace." On May 9, 2000, Nelson e-mailed Cronen with similar complaints and comments. The e-mail stated:

> I really need your help to get some things straightened out around here.
> EBCS has special needs due to the fact that we are different and we have specific language in our contracts and in our bonds that dictates [sic] what the financial health of EBCS is to look like. I understand that this comes from above you. However, I do not want to see what is rapidly becoming the leading profit center destroyed over the ridiculous politics that are at play around here.
> I am getting sick of the second class treatment of my portion of the company. We are certainly not second class when EBI wants to charge us for support services and other overhead. That we are not even using or even have available to use [sic].
> I am sorry that I have been forced to buy into this philosophy. However it is much too prevalent to ignore.
> I want to make a difference. But I can't do it when I am being undermined by the EBI accounting group.

On May 30, 2000, a memo was entered into Nelson' personnel file which reprimanded him for using inappropriate and rude language in an e-mail he had sent to the Accounts Payable Department. The e-mail, sent to Laura Vasatka ("Vasatka"), read:

> I understand that you have time deadlines. I do also. I have way more to do over here than just these check requests. I have been involved in trying to get financial statements done and I am in the middle of five client billings. I take great exception to your department's attitude. Quite frankly if this stuff does not end and

soon you can find someone else to bale your ass out of this EBCS nightmare.

On June 19, 2000, Nelson submitted a Preliminary Proposal for Software Conversion Project. The proposed project suggested changing the accounting practices at EBCS, which were having problems. Changing the accounting software was among the planned fixes. In the summary for the proposal, Nelson suggested replacing their current software, Cost Point, with new software, Timberline, by August 5, 2000. He also suggested transferring the payroll function from Cost Point to Timberline by September 30, 2000. Nelson's project proposal was well received. On June 20, 2000, he was complimented by Rick Miller ("Miller"), CFO of EBCS. Miller told him that his report was very well thought out and comprehensive.

On July 5, 2000, Nelson sent an e-mail to Cronen, and copied to Ershadi along with other upper management personnel, stating that he could not make deadlines for financial reporting with the current software. Nelson also stated that if EBCS did not make changes very soon, the current software was going to bankrupt the firm. Not surprisingly, Nelson's e-mail alarmed upper management and a task force was assembled to look into the current software and evaluate whether or not to keep the system. Ershadi had been on vacation when Nelson sent the e-mail, but on his return he was upset with Nelson for causing turmoil within the company. Nelson was told that he was to communicate only with

Cronen and Ershadi regarding issues he had with his department, and that failure to restrict his communication would be grounds for termination.

On August 8, 2000, and August 29, 2000, Nelson again sent e-mails to Cronen detailing his frustrations with his high workload, and problems getting Timberline approved. The August 8th e-mail stated in part:

> I guess my being upset is nothing new. I do not like the conditions of things around here and am trying to make a difference. However, it seems that I am in this battle myself. Despite you and [Ershadi] telling me that you are there for me I do not see visible evidence of this. Frankly, it borders on you telling me something to get me to be quiet and to go away for awhile [sic]. If that is so, I would appreciate the truth.

The August 29th e-mail stated in part:

> I am very sorry but I am very unhappy with the way things are going around here. I had no idea of the mess that this place was in when I interviewed for and accepted this position. However, that is only half the story. I want to work for a place where I can make a difference. However, every attempt that I have made to try to improve things has been shot down or so drug out that it really does not matter to me any more.
> * * *
> Maybe you thought when you hired me that you were getting a mindless person that would just be happy to continue on with this system. However, I find that hard to believe. I think that you wanted someone who was strong enough to be able to make the changes necessary to improve the process. As you have seen I am not afraid of this task, however I am tired of the brick walls. This work is difficult enough on it's own. I can really do without the internal struggles.
> Maybe I am the wrong person for this position or maybe it is just an impossible position and I am doing as well as anyone could do. I don't know which applies but I think that we both need to evaluate things and something needs to change.
> I trust that we will be having a conversation about this in the near future.

Indeed, Cronen and Nelson had a meeting shortly thereafter regarding the August 29, 2000 e-mail. Cronen told Nelson that he needed to stop sending such e-mails, and that he would "need to do some soul searching as to whether this [was] the right position for [him] or not." Nonetheless, on September 22, 2000, Nelson sent another e-mail to Cronen in which he stated that this "was beyond the shadow of a doubt the most complex mess that I have ever encountered."

On October 5, 2000, Nelson e-mailed Cronen that he was going to leave EBCS. Several days later, on October 10, 2000, Nelson again e-mailed Cronen, stating that his final day at EBCS would be October 27, 2000. However, he inquired about the possibility of transferring to EBI, a move he stated was offered to him on September 28, 2000 and reiterated on October 3, 2000. Nelson did not ultimately leave EBCS, apparently the result of a request by Ershadi to stay.

On January 11, 2001, Nelson sent an e-mail to Cronen and Ershadi listing his projected schedule for implementing the software conversion. Nelson also suggested hiring Sam Trigui ("Trigui") as an assistant to Nelson in the conversion process. Trigui was subsequently hired to assist Nelson. On January 24, 2001, Cronen sent an e-mail to Nelson thanking him for his work, and suggested that once Timberline was up and running that he take a couple of days off.

On March 5, 2001, Cronen wrote out an employee evaluation for Nelson. The evaluation listed managerial duties, and set out the following performance objectives: 1) complete the Timberline conversion and get necessary reports

written; 2) continue training Sam Trigui on all aspects of Timberline; 3) Work on management and people skills. Cronen also wrote that

> Nick is learning to function as a manager. He has been doing an excellent job at getting systems and procedures in place including being implementation manager for Timberline. He needs to focus on interpersonal skills and problem solving skills providing solutions rather than just pointing out problems.
>
> * * *
>
> Nick has an excellent grasp of construction accounting. He understands how the numbers work, and what they mean. People skills and managerial skills need a lot of work. He needs to work on being a problem solver.

On March 15, 2001, Nelson e-mailed Ershadi stating that his workload was too heavy and that he had been neglecting his family as a result. He also expressed concern about the numbers being transferred into Timberline. On March 16, 2001, Nelson reviewed his performance evaluation with Cronen.

On March 20, 2001, Nelson sent an e-mail to Cronen, which he copied to Ershadi, in which he stated:

> I am sorry but I feel that the set-up of Timberline is complete. Are all of the data and reports complete? You know they are not. The data piece of this would have been done last week had [Ershadi] not insisted on seeing a financial statement.
>
> * * *
>
> Why should I be held up because the two of you do not make the time to review my work. By the way this in [sic] not really a new thing as the two of you only looked at my stuff last year when you were forced to. Furthermore, when I went through the microscope that Huddleston applied to my work it all held up. I believe that the only correction that was made is due to the basis being wrong on the allocation of overhead not the procedure that was used.
>
> I think that your decision to hold off on decisions until Timberline is complete is not appropriate. I also do not agree with the salary increase that was offered. That was really bad timing to show that to

> me after the week that I had in dealing with [Ershadi] and the financial statements. I guess that it is my error not to have gotten more concrete answers from you and [Ershadi] as to what you would do for me before I put in the kind of hours that I did. However, I need to know what you intend to do at this point. I am mad enough to walk. Is that what you want? If so let me know and I will move on. I will expect to be compensated at time and a half for the extra hours that I was forced to put in to complete the conversion if that is the route that you want to take. If that is what you want I will render [sic] my resignation this afternoon and take my PTO.

Nelson also e-mailed his wife and asked her if she had kept e-mails that he had been forwarding home, so he could "take them to the DES if that becomes necessary." Later that same day, Ershadi called Nelson into his office for a meeting. At Ershadi's request, Shirl Braziel ("Braziel"), Ershadi's administrative assistant, attended the meeting and took notes.

According to Braziel's notes, Ershadi addressed Nelson's e-mail from earlier that day and informed him that he wanted to work on that issue. Ershadi told Nelson that "his attitude and blatant accusations of . . . Cronen and [Ershadi] would not be tolerated." Ershadi stated that Nelson had complained about everyone at EBCS and that there was documentation of the complaints. Ershadi also told Nelson that he could work as part of the team or he could leave. Nelson was informed that from that point on all further contact on any matters were to go through Cronen, and that any similar e-mails would result in termination.

On April 6, 2001, Cronen e-mailed Nelson with a compensation proposal. The e-mail stated:

> As a follow up of our conversation on 3/22/01 and the reiteration of the same on 4/5/01, the following items were discussed: ranges for

> completion of the Timberline conversion are as follows: salary increase $1,000/$5,000; bonus $1,000/$4,000; [Paid Time Off] 0-5 days.

On April 11, 2001, Nelson e-mailed Cronen, again complaining about his working conditions and expressing dissatisfaction with the potential compensation package offered by EBCS. Nelson stated, "I am not a philanthropist and I do not like working without payment under mandated deadlines, especially when I have been threatened with termination if I do not meet them." Nelson went on to say, "[t]his is not only unfair; it is also illegal!" Nelson further stated, " I am unwilling to work anymore overtime until there is a plan in place for fairly compensating me for that time."

On April 12, 2001, Cronen replied to Nelson's e-mail of the day before:

> Nick, in response to your e-mail, I offer the following:
> 1. We have never forced you to work overtime, nor have we ever threatened you with termination upon failure to do so. The decision to work the additional hours was one made by you. Your core work hours are from 8 until 5 with an hour for lunch. However, as an exempt and responsible employee there are times that the job requires some overtime.
> 2. The deadlines established for various tasks have usually been made based on mutual agreement between you, me, and other personnel as needed. A recent example of this: We were scheduled to meet with the accounting managers and [Ershadi] last Thursday at 10 am to discuss month end closing schedules. You called in that morning advising me that you wouldn't be in until noon that day. This caused all of the accounting managers to rework their schedules in order to move the meeting to 1:00 that day. As we were sitting in that meeting, you indicated that you would have January 2001 numbers for us by the next day. Today, those numbers are three days late.
>
> It appears to me that you are having problems setting realistic deadlines. As I've told you on numerous occasions, if you need additional help all you have to do is ask and I will get you the help

> you need. You currently have two temporary employees working with you (based on your request for additional help) to get the Timberline conversion finished. If you are telling me that is not sufficient, than [sic] maybe we need to look at getting additional help.
> 3. You seem to spend an extraordinary amount of time writing memos such as this. Perhaps your time would be better spent focusing on the work to be done rather than complaining about the same issues continuously yet offering no solutions. As a responsible employee in a supervisory position, you should be recognizing problems as well as identifying the solutions to those problems in a timely manner in accordance to the published accounting calendar for proper feedback to managers and the management.

On April 14, 2001, Nelson sent a letter to Rick Lincicome ("Lincicome"), the president of Ellerbe Becket in purported accordance with the advice of an attorney. In the letter, Nelson wrote that:

> Since January 1 of [2001], I have worked 337.25 hours of overtime, at great detriment to my family and myself. Much of this overtime had been due to mandatory deadlines imposed by my supervisor, Ms. Sue Cronen, and by her supervisor, Mr. Shah Ershadi. During this time, we have gone through a year end audit, unending inquiries from management regarding the 2000 financial statements, and a software conversion to Timberline in addition to our day-to-day work. On more than one occasion when I have protested about the deadlines being unreasonable given this workload Mr. Ershadi has threatened to terminate me should I fail to meet them. In other words, this was mandatory overtime. Additionally, Mr. Ershadi has threatened me with termination if I should ever go to anyone that he reports to regarding his behavior. He dictated a letter to that effect to his secretary in my presence, and informed me (and his secretary) that it would be placed in my employee file.
>
> I have repeatedly asked that Ms. Cronen and Mr. Ershadi develop a plan to compensate me for this unreasonable amount of overtime. After many appeals, I finally received an email memo outlining what they proposed to do for compensation, which is attached for your perusal. I have also attached my response to that email.

> In summary, for the 337.25 hours of overtime that I worked through 3/331/2001, Ms. Cronen and Mr. Ershadi proposed that they might compensate me somewhere between the level of absolutely nothing (zero days of additional PTO time) to a salary increase of $5,000, a bonus of $4,000 and 5 days of PTO time in addition to my regular vacation time at some future date.
>
> My salary prior to this year's review was $50,000 or $24.04 per hour. At time and a half, that works out to $12,160.46 in overtime compensation. Having a memo that says I may be paid nothing for that time is not acceptable. This offer is not only grossly negligent, but is also illegal according to both of the employment attorneys with whom I consulted. As noted in my return memo to Ms. Cronen, I wish to believe that it was not anyone's intent to purposefully act in such a manner, but I have not seen any evidence to the contrary. I have given Ms. Cronen three business days to correct this situation, to no avail.
>
> I would like you to personally see that this matter is rectified. I would like a written statement of exactly how Ellerbe Becket plans to meet its obligation for the overtime I have already worked within the next two business days (with compensation to granted immediately, as allowed by law). I would also like a written plan for future compensation of any mandatory overtime that I may perform. I believe that the underlying management problems should be addressed as you see fit to prevent this type of situation from happening her at Ellerbe Becket in the future.

(Emphasis in original). On May 12, 2001, Nelson received a $5,000 bonus for his work on the Timberline software conversion.

Nelson stated that EBCS wanted him to import inaccurate data into the new system, Timberline, from Cost Point, which was not in agreement with the audited figures. When he refused to enter these figures, Nelson claims that he was told to, "sit down, shut up and to get to work."

On May 22, 2001, Nelson submitted a handwritten note effectuating his resignation. The note read:

> To whom it may concern:
> I hereby give my notice of my decision to terminate my employment with Ellerbe Becket effective immediately.
> I have completely had it with the lack of respect for proper accounting as well as the continuous barrage of "management" requests to the out to "bad" information.
> Not to mention the complete unwillingness to discuss ways to improve the process.
> Sincerely,
> Nicky R. Nelson

Nelson subsequently commenced this action on September 5, 2001.

## III. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219-20 (8th Cir. 1992). The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. See Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik, 47 F.3d at 957. The Court must view the evidence, and the inferences that may be reasonably drawn from the evidence, in the light most favorable to the nonmoving party. See Enter. Bank v. Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). However, "summary judgment

procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designated to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327 (quotation omitted).

**B. Defendants' Motion for Summary Judgment**

**1. Nelson's Wage and Hour Claims**

Nelson alleges that he was entitled to overtime payments from EBCS. Under the FLSA, employees who work in excess of 40 hours per week must be paid overtime at a rate of one and one-half times their normal hourly wage. See 29 U.S.C. § 207(a)(1). Nonetheless, certain types of employees, including administrative employees, are exempt from the overtime requirement. See 29 U.S.C. § 213(a)(1). To determine whether a particular employee falls under the administrative exemption, the Department of Labor ("DOL") created a long test and a short test. See 29 C.F.R. § 541.2.

Where an employee is paid over $250 per week, it is appropriate to use the short test. See §§ 541.2(e)2, 541.214(a); McCallister v. Transamerica Occidental Life Ins. Co., 325 F.3d 997, 1000 (8th Cir. 2003). The record indicates that Nelson was paid $1923.08 every two-week pay period from March 2000 until March 15, 2001. The amount did not vary and was not reduced at any time. Nelson was given a raise on March 15, 2001, and was subsequently paid $1980.77 every two-week pay period. In addition to his salary, Nelson was paid a year-end

bonus of $1120.00 on March 15, 2001 and a performance bonus of $5,000.000 on May 12, 2001. Thus, in this case it is appropriate to use the short test. See id.

Under the short test, three criteria must be satisfied in order for an employee to be considered an exempt employee: 1) the employee must have been "salaried"; 2) the employee's primary duties must be directly related to management policies or business operation; and 3) the employee must have customarily and regularly exercised discretion and independent judgment. See 29 C.F.R. § 541.2.

**a. Salary**

An employee is considered to be paid on a salary basis if he "regularly receives each pay period on a weekly or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed." 29 C.F.R. § 541.212.

As noted above, Nelson was paid $1923.08 every two-week pay period from March 2000 until March 15, 2001. The amount did not vary and was not reduced at any time. Nelson was given a raise on March 15, 2001, and was subsequently paid $1980.77 every two-week pay period. In addition to his salary, Nelson was paid a year-end bonus of $1120.00 on March 15, 2001 and a performance bonus of $5,000.000 on May 12, 2001.

Nonetheless, Nelson claims that EBCS continued to treat him as an hourly employee. He was required to submit his hours for each day and he routinely

submitted his overtime hours. Nelson also claims that though he was not docked pay, he *could* have been docked pay, which makes him an unsalaried employee. Nelson directs the Court to case law outside the Eighth Circuit to support his contention that the possibility that his pay could have been docked is dispositive as to whether he is considered an exempt employee. See Martin v. Malcom Pirnie, 949 F.2d 611, 615 (2d Cir. 1991); Abshire v. County of Kern, 908 F.2d 483, 487 (9th Cir. 1990); See also Klein v. Rush-Presbyterian-St. Luke's Medical Center, 990 F.2d 279, 286 (7th Cir. 1993); Banks v. City of North Little Rock, 708 F.Supp. 1023, 1025 (E.D. Ark. 1988).

EBCS responds that the case law Nelson has cited to support his contention that he was not a salaried employee is no longer good law. EBCS argues that Nelson improperly relies on Abshire, for the proposition that the mere possibility of a deduction from wages establishes that an employee is not salaried. EBCS notes that in McDonnell v. Omaha, Neb., 999 F.2d 293, 296-97 (8th Cir. 1993) (imposing requirement of actual deductions), the Eighth Circuit expressly rejected the Abshire reasoning, holding that the mere possibility of an improper deduction in pay does not defeat an employee's salaried status. EBCS takes the position that the Eighth Circuit's position was later adopted by the Supreme Court in Auer v. Robins, 519 U.S. 452, 460-61 (1997). Nelson responds that Auer is a case where the court was "reading the statute as it applies to public-sector employees," Auer at 454, and therefore does not apply when a private sector employee is involved, such as is the case here.

In Auer, the Supreme Court addressed the question of whether the possibility of a pay deduction renders an employee non-exempt under the salary-basis test. See id. at 460. The Court adopted the position of the Secretary of Labor, who interpreted "the salary-basis test to deny exempt status when employees are covered by a policy that permits . . . deductions in pay 'as a practical matter.'" Id. at 461 (citing to *amicus* brief submitted by the Secretary of Labor). A policy that permits deductions in pay as a practical matter exists "if there is either an actual practice of making such deductions or a[] . . . policy that creates a 'significant likelihood' of such deductions." Id. The Court held that "[t]he Secretary's approach rejects a wooden requirement of requiring actual deductions, but in their absence it requires a clear and particularized policy . . . which 'effectively communicates' that deductions will be made in specified circumstances." Id.

The Court first notes that EBCS's position that the Supreme Court adopted McDonnell's holding in Auer is wrong. McDonnell imposed the requirement of actual deductions. See 999 F.2d at 296-97. As noted above, the Auer Court adopted the Secretary of Labor's interpretation, which rejected such a "wooden requirement." See 519 U.S. at 461.

Next, the Court considers Nelson's contention that Auer does not apply to this matter because it arose in the context of public-sector employment. Nelson's contention is without merit. While the Auer Court issued its ruling in the context of public-sector employment, the matter involved the interpretation of 29 C.F.R. §

541.118, a Department of Labor regulation which applies to all employees. See § 541.118(a). Furthermore, the Eighth Circuit has specifically applied Auer's holding in where the issue arose in the context of private-sector employment. See McAllister, 325 F.3d at 1000.

Despite the fact that Nelson's pay never varied, Nelson contends that he still cannot be considered an exempt employee under Auer's reading of the salary basis test, because EBCS's policy was clear and particularized, and effectively communicated to him that deductions could be made that would apply to him. Nelson contends that the PTO policy applied to him, and that EBCS's Staff Guidelines for PTO informed staff that employees might end up with a lack of hours in their PTO account, thus "leaving the employee with the only option of taking time off without pay." Nelson argues that under the PTO guidelines, employees who exceeded their yearly allowance of PTO would be forced to take time off without pay, and therefore would suffer a deduction in pay.

The Court notes that the relevant guidelines provision arises under the section dealing with how to donate PTO hours to other employees and specifically references serious personal or family situations. In the Court's view, this provision is too attenuated to constitute "a clear and particularized policy . . . which 'effectively communicates' that deductions will be made in specified circumstances." Auer at 461. Indeed, the Auer Court noted that in adopting the Secretary of Labor's position, employers could avoid "the imposition of massive and unanticipated overtime liability . . . in situations in which a vague or broadly

worded policy is nominally applicable to a whole range of personnel but is not 'significantly likely' to be invoked against salaried employees." Id.

Plaintiff has not directed the Court to any other provision indicating that he was subject to partial day deductions. Nothing in the record before the Court could lead a reasonable fact finder to conclude that Nelson's "salary was in jeopardy of being reduced based on the quality or quantity of the work he performed." McAllister, 325 F.3d at 1000; see also Jastremski v. Safecor Ins. Companies, 243 F.Supp.2d 743, 750 (N.D. Ohio 2003) (holding that neither vacation policy nor sick leave policy communicated in clear and particularized manner that employee's in plaintiff's classification would be subject to deductions); compare with Takacs v. Hahn Automotive Corp., 246 F.3d 776, 781 (6th Cir. 2001) (holding that defendant had actual practice of deducting from employee's pay and members of management were explicitly subject to pay deductions).

**b. Primary Duties**

In addition to receiving a salary instead of hourly compensation, an employee's primary job duties must consist of office or nonmanual work directly related to management policies or general business operations. See 29 C.F.R. § 541.2(a)(1). In evaluating whether an employee's primary duties are directly related to management policies or business operation, the following factors are considered: (1) the relative importance of the administrative duties as compared with other types of duties; (2) the frequency with which the employee exercises

discretionary powers; (3) his relative freedom from supervision; and (4) the relationship between his salary and the wages paid other employees for the kind of non-exempt work performed by the administrator. See 29 C.F.R. § 541.206(b).

As a general rule, an employee's primary job duty is that which occupies more than 50 percent of his or her time. See 29 C.F.R. § 541.103; Spinden v. GS Roofing Products Co., Inc., 94 F.3d 421, 427 (8th Cir. 1997). Nonetheless, EBCS points out that an employee can be classified as an exempt employee even if up to 90 percent of his or her duties can classified as routine and nondiscretionary in nature. See Spinden, 94 F.3d at 427; see also Murray v. Stuckey's, Inc., 939 F.2d 614, 618 (8th Cir. 1991) (holding that fact that employee spent 65 to 90 percent of time on nonexempt tasks was not controlling factor under the regulations), cert. denied, 502 U.S. 1073 (1992). "[A]n employee's primary duty is that which is of principle importance to the employer rather than collateral tasks which may take up more than 50% of his or her time." Id.

Nelson disagrees with EBCS, claiming that at least 50 percent of his job duties must have directly related to management policies or general business operations. See 29 C.F.R. § 541.103; 29 C.F.R. § 541.206(b). Nelson argues that EBCS relies upon dicta from Spinden, which only illustrated that although a person may not spend the majority of their time actually doing their primary function, other factors reveal that their primary function is managerial. Nelson goes on to assert that less than 50 percent of his job duties directly related to management policies or general business operations. This Court concludes that it

is improper to use the quantum of administrative work as the litmus test. See Spinden, 94 F.3d at 421 n.5 (citing 29 C.F.R. § 541.201(b)(2)); cf. 29 C.F.R. § 541.201(b)(1) (stating that a title alone is of little or no assistance in determining the true importance of an employee to the employer).

EBCS asserts that Nelson was hired to run EBCS's accounting department and was responsible for all accounting functions within EBCS, and that part of his duties included evaluating the current accounting software, analyzing the needs of the company going forward, and making recommendations to upper management for any changes in the accounting software, all tasks Nelson undertook starting his first day at EBCS.

EBCS further asserts that Nelson was relatively free of supervision and highly paid. EBCS argues that Nelson's lack of direct supervision and the relationship between his salary and the salary of other employees in his department is further evidence that Nelson's primary duty at EBCS was that of an exempt administrative employee. EBCS also points to the hiring of Sam Trigui to assist Nelson, as an example of Nelson undertaking the supervision and training of staff.

Nelson asserts that as an accountant, his duties at EBCS were not directly related to management policies or business operations. Nelson denies that he supervised anyone. He asserts that his duties were strictly clerical, and he provided deposition testimony that he had no management authority, whether it was making decisions or otherwise. Furthermore, Nelson cites to Clark v. J.M.

Benson Co., Inc. 789 F.2d 282 (4th Cir. 1986); for the proposition that accountants are generally non-exempt under the FLSA. Nelson's citation to Clark is misplaced. Clark dealt with an employee hired to undertake *bookkeeping* duties. See 789 F.2d at 284, 286-87 (emphasis added). In coming to its decision, the Court in Clark noted that "bookkeepers . . . and clerks of various kinds hold the run-of-the-mine positions in any ordinary business and are not performing work directly related to management policies or general business operations." Id. at 286-87 (citing 29 C.F.R. § 541.205 (c)(1)). The regulations, far from explicitly or implicitly conveying that accountants typically do not fall under the exemption, state that "[s]ome accountants may qualify for exemption as bona fide administrative employees." 29 C.F.R. § 541.301(f).

The facts are close, but the Court is faced with conflicting testimony regarding the relative importance of Nelson's administrative duties as compared with his other duties, the frequency with which Nelson exercised discretion, and Nelson's relative freedom from supervision. Credibility determinations and weighing of evidence must be undertaken before a determination as to Nelson's exempt status under this factor can be made. Accordingly, a genuine issue of material fact exists with respect to this factor.

**c. Exercise of Discretion and Independent Judgment**

The third prong of the short test requires that an employee exercise discretion and independent judgment. See 29 C.F.R. § 541.2(e)(2). The exercise of discretion and independent judgment "involves the comparison and evaluation

of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. 541.207(a). Further, it means "that the person has the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." Id.

EBCS asserts that Nelson's work included the exercise of discretion and independent judgment. EBCS argues that Nelson was engaged in activities that clearly required his use of discretion and independent judgment, and points to the fact that he was in charge of software conversion, made recommendations for additional personnel for his project, and trained and evaluated the personnel.

According to EBCS, this factor does not require that Nelson exercise discretion and independent judgment in every phase of his work, and instead argues that if Nelson spent as little as 10% of his time engaged in duties that require discretion and independent judgment, he may be found to be within the exception. See e.g., Spinden at 429.

EBCS cites Piscione v. Ernst and Young, L.L.P., for the proposition that while the regulations require the employee to exercise independent judgment, the term does not require this judgment to be made in isolation. See 171 F.3d 527, 535 (7th Cir. 1999). The Piscione Court held that even though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of deiscretion and independent judgment. Id.

Nelson disputes EBCS's reliance on Piscione, arguing that Piscione involved a consultant who had held the title of "manager," while he was an accountant, and that the facts differ in other substantial ways. Nelson claims that he had no supervisory or independent management authority over anyone, and was closely supervised himself. Nelson asserts that he conducted mostly data entry, and that Trigui, his assistant, was reported directly to Cronen, and not to him. He further claims that he did not have the power to hire or fire anyone, and that Cronen did the evaluated Trigui's job performance.

Nelson also claims that he was treated like a child, and was told that he would be fired if he contacted anyone above him other than Cronen, about anything. He argues that such treatment is indicative of his lack of independence and discretion within the company.

EBCS maintains that it has met its burden, and that its motion is supported by documentation authored by Nelson, as well as deposition testimony from Nelson and his supervisors, which creates a sufficient factual background for the Court to issue summary judgment in favor of EBCS.

As with the second prong of the test, the Court is faced with conflicting testimony regarding Nelson's exercise of discretion and independent judgment. Credibility determinations and weighing of evidence must be undertaken before a determination as to Nelson's exempt status under this factor can be made. Accordingly, a genuine issue of material fact exists with respect to this factor.

### 2. Nelson's Whistleblower Claim

Nelson asserts a claim against EBCS under Minnesota Statutes, section 181.932, colloquially known as the "whistleblower" statute. Section 181.932 mandates that:

> An employer shall not discharge, discipline, threaten, or otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because: (a) The employee, or a person acting on behalf of an employee, in good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

Minn. Stat. § 181.932, subd. 1.

The Minnesota courts apply the McDonnell Douglas burden-shifting analysis, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to resolve claims under section 181.932. See Nichols v. Metro. Ctr. For Indep. Living, 50 F.3d 514, 516 (8th Cir. 1995) (citations omitted). A plaintiff asserting a claim under section 181.932 must establish a prima facie case; the employer must then present a legitimate reason for its action; and the factfinder must decide whether the employer's reasons are pretextual. See Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1119 (8th Cir. 1997). Under section 181.932, to establish a prima facie case plaintiff must show: 1) statutorily protected conduct by the employee; 2) adverse employment action by the employer; and 3) a causal connection between the two. See Nichols, 50 F.3d at 516 (citing Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 444 (Minn. 1983)).

### a. Statutorily Protected Conduct

Section 181.932 protects an employee who reports a good faith violation of any federal or state law, including violations of wage and hour laws. See Anderson-Johanningmeier v. Mid-Minnesota Women's Center, Inc., 637 N.W.2d 270, 274 (Minn. 2002). However, it is not enough to simply determine whether an employee made reports of suspected violations of law; the Court must also answer the critical question of whether those reports were made in good faith. See Obst v. Microtron, Inc., 614 N.W.2d 196, 202 (Minn. 2000).

Nelson identifies a number of "reports," which form the basis for his whistleblower claim: 1) the March 20, 2001, e-mail, in which he stated, "I . . . expect to be compensated at time and a half for the extra hours I was forced to put in to the conversion"; 2) the April 11, 2001, e-mail, in which he stated, "I need to be compensated for the extra time I have had to work," and "I do not like having to work overtime without payment under mandated deadlines . . . [t]his is not only unfair; it is also illegal!!"; 3) the April 14, 2001, letter to Lincicome, in which he tallied the overtime hours he believed he was owed compensation for, and informed Lincicome that EBCS's actions were illegal; 4) on April 19, 2001, he raised the issue of overtime with Cronen; and 5) when he indicated that he could not enter inaccurate data into the Timberline system from the Costpoint system.

It is the Court's conclusion that the record construed in a light most favorable to Nelson could support a finding that he reported suspected violations of law to EBCS. It is the Court's further conclusion that the record supports a

finding that the reports were made in good faith. See, e.g., Abraham v. Hennepin County, 639 N.W.2d 342, 354 (Minn. 2002) (finding cause of action where reports reflected self-interest); Anderson-Johanningmeier, 637 at 277 (rejecting importation of public policy requirement into section 181.932).

**b. Adverse Employment Action**

In addition making out a prima facie case of a good faith report, Nelson must also show the Court that he suffered an adverse employment action at the hands of EBCS. See Nichols, 50 F.3d at 516. The resolution of EBCS's motion, in the Court's view, turns on this question of whether EBCS retaliated against Nelson. Nelson claims he was subjected to adverse job consequences including being harassed, threatened with termination and a hostile work environment. He also claims that when he refused to enter inaccurate data into the Timberline system, that he was told to, "sit down, shut up and to get to work."

Nelson's assertions notwithstanding, the uncontroverted record shows that EBCS, rather than taking adverse action against Nelson, actually treated him favorably. EBCS paid Nelson a year-end bonus of $1,120.00 on March 15, 2001 and a performance bonus of $5,000.000 on May 12, 2001. Furthermore, the Court notes that Nelson accepted the May 12, 2001, bonus and then voluntarily quit 10 days later. Based on the record, no reasonable juror could find Nelson suffered an adverse employment action. For this reason, EBCS's motion as to Nelson's whistleblower claim must be granted.

**c. Causal Connection**

Because the record in this matter cannot support a finding that Nelson suffered an adverse employment action there is no need to consider whether a causal connection can be established.

**C. Plaintiff's Motion for Partial Summary Judgment**

Nelson asserts that he, rather than EBCS, is the party entitled to summary judgment on his FLSA claim. Nelson's motion is conclusory and bereft of analysis. In fact it consists entirely of the assertion that even the facts taken in a light most favorable to EBCS fail to establish any basis to conclude that he was an exempt employee. As noted above, in the Court's analysis of EBCS's motion for summary judgment on Nelson's FLSA claim, genuine issues of material fact exist with respect to the second and third prongs of the administration exemption short test.

## IV. Conclusion

With respect to EBCS's motion for summary judgment on Nelson's FLSA claim, under the short test to determine whether he was an exempt administrative employee, EBCS has proved that he was a salaried employee, but genuine questions of material fact exist as to his primary duties were administrative in nature, and whether he exercised sufficient discretion and independent judgment. With respect to EBCS's motion for summary judgment on Nelson's whistleblower claim, the record cannot support a finding of adverse employment action nor a causal connection with any statutorily protected conduct. With respect to Nelson's

motion for summary judgment on his FLSA claim, the same genuine issues of material fact that preclude judgment for EBCS, preclude judgment for Nelson.

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part, as follows:

   a. Defendant's motion is granted with respect to Plaintiff's whistleblower claim; and

   b. Denied with respect to Plaintiff's FLSA claim.

Dated: Sept 16, 2003

Michael J. Davis
Michael J. Davis
United States District Court Judge